## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| LISA L. SQUIREK, | CASE NO. 1:23-cv-00726 |
| Plaintiff, | DISTRICT JUDGE BRIDGET MEEHAN BRENNAN |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Lisa A. Squirek ("Plaintiff" or "Ms. Squirek") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

### I.    Procedural History

Ms. Squirek filed an application for DIB on January 22, 2021.  (Tr. 15.)  She alleged a disability onset date of May 1, 2020, due to heart issues.  (Tr. 15, 80, 91, 192.)  Her application was denied at the initial level (Tr. 97-91) and upon reconsideration (Tr. 76-80).  She requested a hearing.  (Tr. 95-96.)  A telephonic hearing was conducted before an Administrative Law Judge ("ALJ") on January 14, 2022.  (Tr. 30-59.)

The ALJ issued an unfavorable decision on January 25, 2022, finding Ms. Squirek had

not been under a disability from May 1, 2020, through the date of the decision. (Tr. 12-29.) The

Appeals Council denied Ms. Squirek's request for review on February 9, 2023, making the

ALJ's decision the final decision of the Commissioner. (Tr. 1-6.) Ms. Squirek then filed this

pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 6, 8, 9).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Squirek was born in 1969. (Tr. 25.) She was 50 years old on the alleged disability

onset date. (*Id*.) At the time of the hearing, she lived with her husband and adult son. (Tr. 38.)

She is a high school graduate (Tr. 25) with past work as a retail stock clerk (Tr. 39-42, 51).

### B.    Medical Evidence

#### 1.    Treatment History

On March 5, 2020, Ms. Squirek presented to Jason Sustersic, D.O., at University

Hospitals to establish with a new physician, complaining of cough and congestion. (Tr. 253-54.)

On examination, Ms. Squirek was alert and in no acute distress. (Tr. 254.) There was tenderness

to palpation in the face and sinuses. (*Id*.) Ms. Squirek's heart rate and rhythm were normal.

(*Id*.) There was no respiratory distress and breath sounds were clear bilaterally. (*Id*.) Ms.

Squirek was instructed to finish a full course of antibiotics with plenty of fluids. (*Id*.)

On May 14, 2020, Ms. Squirek presented to Dr. Sustersic, complaining of congestion,

postnasal drainage, slight wheezing, and intermittent crampy abdominal pain. (Tr. 250-52.) She

reported taking amitriptyline for insomnia and that it was working well. (Tr. 250.) Examination

findings were unremarkable. (Tr. 251.) Dr. Sustersic ordered an abdominal x-ray and

recommended that Ms. Squirek start taking over-the-counter MiraLAX to address her abdominal

pain.  (*Id.*)  He recommended that Ms. Squirek continue taking insomnia medication and administered a cortisone injection for her allergic rhinitis symptoms.  (Tr. 251-52.)

On June 5, 2020, Ms. Squirek presented to Dr. Sustersic, complaining of swollen legs for four to five days. (Tr. 247-49.)  She denied chest pains or shortness of breath, but said that her heart rate had been elevated, which she said might just be because she was nervous.  (Tr. 247.)  She also complained of some ongoing abdominal pain.  (*Id.*)  Dr. Sustersic noted that Ms. Squirek's abdominal x-ray showed no acute process but possible hepatomegaly.  (*Id.*)  On examination, she was in no respiratory distress but had abnormal heart auscultation and her heart rate was tachycardia.  (Tr. 248.)  Her heart rhythm was regular, and no murmurs were heard.  (*Id.*)  There was nonpitting edema present.  (*Id.*)  She was in no respiratory distress and her breath sounds were clear bilaterally.  (*Id.*)  Dr. Sustersic performed an EKG in the office which showed tachycardic.  (Tr. 249.)  Dr. Sustersic ordered a chest x-ray, blood work, and an upper quadrant ultrasound.  (*Id.*)  He also started Ms. Squirek on a low-dose Lasix and advised her to elevate her legs and call with any other symptoms.  (*Id.*)

On June 18, 2020, Ms. Squirek returned to Dr. Sustersic for follow up regarding her lower extremity edema, pleural effusion, and insomnia.  (Tr. 244-46.)  Her abdominal workup was normal and her chest x-ray showed a small pleural effusion.  (Tr. 244.)  She reported she was still having some shortness of breath and mild tachycardia, but denied chest pain or palpitations.  (*Id.*)  Examination findings were unremarkable, including normal heart rate, no peripheral edema, and no respiratory distress.  (Tr. 245.)  Dr. Sustersic ordered an echocardiogram and chest x-ray, and refilled Ms. Squirek's insomnia medication.  (Tr. 245-46.)

On July 16, 2020, Ms. Squirek had an echocardiogram at University Hospitals MP-Cardiology-Parma.  (Tr. 264-67.)  It showed that Ms. Squirek's left ventricular systolic function

was mildly decreased with a 45% estimated ejection fraction; her mitral valve was thickened with mildly restricted motion of both leaflets; and she had severe mitral valve regurgitation, moderate to severely elevated right ventricular systolic pressure, and global hypokinesis of the left ventricle with minor regional variations.  (Tr. 265).

On August 6, 2020, Ms. Squirek presented to Raju Modi, M.D., at MP-Cardiology-Parma for evaluation regarding her acute onset of shortness of breath, lower extremity edema, and abnormal echocardiogram.  (Tr. 268-71.)  She reported improvement in her symptoms with Lasix; her edema was gone and her breathing was better.  (Tr. 269.)  She said she was "active" at work, "going up and down stairs without any difficulty." (*Id*.)  She reported smoking a pack of cigarettes a day and was urged to stop smoking.  (Tr. 269-70.)  Examination findings were unmarkable.  (Tr. 271.)  Dr. Modi recommended a transesophageal echocardiogram to better examine the mitral valve.  (Tr. 269.)  He noted that Ms. Squirek's ejection fraction was more likely 35-40% than 45%, taking her mitral regurgitation into account.  (*Id*.)  Dr. Modi indicated she did not appear to be volume overloaded.  (*Id*.)  He stated she was classified at New York Heart Association ("NYHA") class II stage B congestive heart failure.  (*Id*.)  He started Ms. Squirek on medication, recommended that she limit her sodium and fluid intake and weigh herself daily, and recommended an exercise nuclear stress test.  (*Id*.)

Cardiac calcium testing performed on August 14, 2020, revealed a mildly increased risk for coronary artery disease.  (Tr. 273-74.)  A stress test on August 18, 2020, was abnormal with evidence of ischemia involving the lateral wall and an exercise ejection fraction of 37%.  (Tr. 275-76.)  During the stress testing, Ms. Squirek achieved 6.5 METS.  (Tr. 275.)  Additional stress testing results showed a negative stress EKG for ischemia, below average functional capacity for her age, exercise associated significant shortness of breath, and an appropriate blood

pressure response with exercise (Tr. 279).  A transesophageal echocardiogram performed on August 20, 2020, showed moderately decreased left ventricular systolic function with a 35-40% estimated ejection fraction, moderately dilated left atrium, mild mitral valve stenosis, and severe mitral valve regurgitation.  (Tr. 280-81.)

On September 19, 2020, Ms. Squirek met with Marc Pelletier, M.D., at University Hospitals for a telehealth visit.  (Tr. 426-29.)  Dr. Pelletier informed Ms. Squirek that he felt she would benefit from mitral valve replacement.  (Tr. 426.)  He indicated that the goal of the surgery would be to improve her quality of life and improve her long-term survival.  (*Id*.)  Ms. Squirek reported she had been unable to work for a few months, partly due to the Covid-19 pandemic.  (Tr. 427.)  She reported significant shortness of breath with moderate activity that had improved significantly with carvedilol.  (*Id*.)

On September 17, 2020, Ms. Squirek underwent a heart catheterization.  (Tr. 286-91, 420-25.)  The results showed: elevated right heart filling pressures moderately; normal cardiac output; severe two-vessel coronary disease; and moderate disease in the mid LAD with 40-50% stenosis.  (Tr. 287, 291.)  The recommendation following the heart catheterization was surgical correction due to her mild to moderate mitral stenosis with severe mitral regurgitation.  (Tr. 287, 291, 424.)

On October 1, 2020, Ms. Squirek returned to Dr. Modi for follow up.  (Tr. 292-94.)  She was doing well.  (Tr. 293.)  She had started carvedilol and her breathing was easier.  (*Id*.)  She was trying to quit smoking; she had cut back to five or six cigarettes a day.  (*Id*.)

On October 14, 2020, Ms. Squirek underwent coronary artery bypass grafting, mitral valve replacement, intraoperative assessment of bypass grafts with duplex, endoscopic vein

harvesting, and endoscopic left radial artery harvesting.  (Tr. 299-301.)  She was discharged on October 26, 2020.  (Tr. 307-12.)

On October 30, 2020, Ms. Squirek returned to Dr. Sustersic for follow up after her surgery.  (Tr. 240-43.)  She still had some fatigue but was doing well post-operatively.  (Tr. 240.)  She was compliant with her new medications and would be going to cardiac rehab.  (*Id*.)  She denied chest pain, shortness of breath on exertion or at rest, and lower extremity edema.  (*Id*.)  Cardiovascular examination findings were normal.  (Tr. 242.)  Musculoskeletal examination findings were also normal, including no joint swelling, normal movement in extremities, normal range of motion, and normal muscle strength and tone.  (*Id*.)

On November 17, 2020, Ms. Squirek returned to Dr. Modi for follow up.  (Tr. 317-20.)  She reported "feeling better than her preop status."  (Tr. 318.)  She was feeling less shortness of breath, more endurance, and had no edema.  (*Id*.)  She was smoke free at that time.  (*Id*.)  On examination, she was in no distress with a pleasant disposition and had regular heart rhythm and no murmurs.  (Tr. 320.)

On December 2, 2020, Ms. Squirek returned for a cardiology follow up at University Hospitals.  (Tr. 440-43.)  She saw Dr. Pelletier, who noted that her chest x-ray that day was "very clear" with no pleural effusion and sternal wires that were "nicely aligned."  (Tr. 440.)  Her EKG showed normal sinus rhythm.  (*Id*.)  Ms. Squirek reported that she was "much less short of breath than she was before the operation, she [had] more energy, and [she] [was] able to walk with much less difficulty."  (Tr. 441.)  She reported that she had "minimal discomfort in her chest" during the day and had no swelling in her hands or feet.  (*Id*.)  Her biggest issue was pain during the night.  (*Id*.)  Dr. Pelletier noted: "Overall, we are very pleased with her progress from a cardiac point of view."  (Tr. 440.)  He noted that she had stopped smoking, which was

"excellent news," but he noted concern over her opioid use.  (*Id*.)  She was instructed to take Aleve in the evenings and to try to transition to Tylenol.  (*Id*.)  He provided her with a refill for twelve OxyContin, but instructed her that no further opioid prescriptions would be provided by their department.  (*Id*.)  She expressed understanding of this and felt confident she could wean herself off of opioids since she had been informed that she could take something like Aleve, Motrin, or Advil even though she was taking Coumadin.  (Tr. 440-41.)  Dr. Pelletier noted cardiac surgery would be happy to see Ms. Squirek in the future, if necessary, but there was no need for further follow up with their department.  (Tr. 441.)

Ms. Squirek had her first cardiopulmonary rehab session on December 23, 2020.  (Tr. 333.)  She continued cardiac rehab for a total of thirty-six sessions through April 16, 2021.  (Tr. 334-402.)  In all but two of her sessions, Ms. Squirek was observed to tolerate the exercises well and voiced no complaints throughout the session; her pain level was recorded as 0/10 in almost all instances.[1]  (Tr. 333, 335, 340, 342, 344, 346, 348, 350, 352, 354, 356, 358, 360, 364, 366, 368, 370, 372, 374, 376, 378, 380, 382, 384, 386, 388, 390, 392, 394, 396, 398, 400, 402.) During her December 30, 2020 session, it was noted that Ms. Squirek tolerated the exercise well and voiced no complaints or symptoms throughout the exercise session, but it was also noted that she reported feeling "sweaty after completing the arm egometer modality" and that she rested before moving on to the next modality.  (Tr. 337.)  During the treadmill modality, she reported a RPE of "15" and the treadmill speed was reduced to 2.0 MPH.  (*Id*.)  During her February 8, 2021 session, Ms. Squirek reported that she was stressed that day.  (Tr. 362.)  It was noted that her heart rate stayed up a little longer than usual, but Ms. Squirek reported feeling fine otherwise. (*Id*.)  The maximum aerobic workload reached by Ms. Squirek at her first cardiac rehab session

---

[1] In those instances where Ms. Squirek's pain level was not specifically recorded as 0/10, there were no indications that pain was reported.  (Tr. 398, 400, 402.)

was 2.8 metabolic equivalents ("METs"); the maximum aerobic workload she reached at her final cardiac rehab session 4.2 METs.  (Tr. 333, 402.)

A January 5, 2021 echocardiogram showed: a moderately decreased left ventricular systolic function with an estimated ejection fraction of 40%; a well-seated mechanical prosthetic MVR with mild transvalvular regurgitation and a slightly elevated mean transmittal gradient; and global hypokinesis of the left ventricle with minor regional variations.  (Tr. 417-18.)

On February 23, 2021, Ms. Squirek returned to Dr. Modi for follow up.  (Tr. 328-31.) She reported improvement in her breathing and endurance since before her surgery, but not much improvement since her visit in November.  (Tr. 329.)  She reported that she still had incisional pain.  (*Id*.)  It was noted that her heart rates were elevated during cardiac rehab.  (*Id*.) Examination findings were unremarkable.  (Tr. 331.)  Dr. Modi recommended that Ms. Squirek continue taking Coumadin, aspirin, and statins.  (Tr. 329.)  He noted that Ms. Squirek's ejection fraction was 40% post-operatively and remained 40% on the echocardiogram.  (*Id*.)  He increased her carvedilol dosing, but also indicated that he found no evidence of decompensated heart failure.  (*Id*.)  He increased her medication for hyperlipidemia.  (*Id*.)  Ms. Squirek had resumed smoking cigarettes on occasion.  (*Id*.)  Dr. Modi encouraged her to quit.  (*Id*.)  He instructed her to return for follow up in six months.  (*Id*.)

On August 18, 2021, Ms. Squirek returned to Dr. Modi for follow up.  (Tr. 461-64.)  Ms. Squirek reported feeling well overall.  (Tr. 462.)  She had stopped smoking but restarted.  (*Id*.) She was walking regularly.  (*Id*.)  She had gained some weight and her blood pressures were running higher, but she reported no cardiac symptoms and no palpitations.  (*Id*.)  Examination findings were unremarkable.  (Tr. 464.)  Dr. Modi recommended that Ms. Squirek continue taking Coumadin, aspirin, and statins.  (Tr. 462.)  He increased her carvedilol. (*Id*.)  He observed

8

that the prior increase in Ms. Squirek's hyperlipidemia medication had helped. (*Id*.) He noted that increasing activity would also help. (*Id*.) Dr. Modi continue to encourage Ms. Squirek to quit smoking. (*Id*.) He instructed her to return for follow up in six months. (*Id*.)

### 2. Opinion Evidence

On March 10, 2021, state agency medical consultant Gary Hinzman, M.D., completed a physical RFC assessment. (Tr. 63-65.) He opined that Ms. Squirek could: lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 64.) He also opined that she could: never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs; and frequently balance. (*Id*.) He opined that she could not be exposed to unprotected heights, hazardous moving machinery, or commercial driving. (*Id*.)

At the reconsideration level, on July 15, 2021, state agency medical consultant W. Scott Bolz, M.D., affirmed Dr. Hinzman's RFC finding. (Tr. 71-73.)

### C. Hearing Testimony

### 1. Plaintiff's Testimony

At the January 14, 2022 telephonic hearing, Ms. Squirek testified in response to questioning by the ALJ and her representative. (Tr. 37-50.) She explained that she had not worked since May 2020 because she had open heart surgery, a triple bypass, and a valve replacement, and had shortness of breath walking even fifty feet and had throbbing pain in her legs if she stood for over an hour. (Tr. 42.) She could not work her job because they would not let her sit down. (*Id*.) She was seeing her doctor every six months for checkups. (Tr. 42-43.) She had attended cardiac rehab for about three to four months following her surgery, for a total of thirty-six classes. (Tr. 43.) Her doctor wanted her to attend more cardiac rehab but she could

not afford it.  (Tr. 43.)  She was taking five different medications for her heart and cholesterol.

(*Id.*)  One of her medications was a water pill which caused her to use the restroom every half an

hour.  (Tr. 46-47.)  She tried not to drink as much to minimize the frequency with which she had

to use the restroom.  (Tr. 47.)  On a "good day," the least she would have to use the restroom

was five times during the day.  (*Id.*)

Ms. Squirek said that her symptoms, which included shortness of breath, throbbing leg

pain, and occasional throbbing pain in her chest, limited her ability to stand and pick up anything

heavier than a gallon of milk.  (Tr. 43-44.)  She said she had to be careful not to get a bacterial

infection given her condition.  (Tr. 44.)  She also had to be careful not to fall given the weakness

in her legs because she could cut herself which would be problematic given that she was on

Coumadin and it would take her a while to stop bleeding.  (Tr. 49.)  She reported falling once

due to pain in her legs, but she did not hit her head.  (*Id.*)

Ms. Squirek reported she could perform light chores such as doing a light load of

laundry, filling up the dishwasher, or doing light dusting, but had to relax after performing the

chores.  (Tr. 44, 45.)  She was unable to do "a lot at once."  (Tr. 44.)  If she went shopping, she

usually had someone with her because she could not lift heavy items.  (*Id.*)  She also said that

shopping took her a long time because she had to take breaks.  (*Id.*)  She cooked about once a

week, with help from her husband or son.  (Tr. 45.)  Her husband and son took care of other

household chores.  (*Id.*)

The most comfortable position for Ms. Squirek was lying on her back.  (Tr. 48.)  She

estimated being in that position for six waking hours each day.  (*Id.*)  She elevated her legs to

waist level about half of the time when sitting.  (*Id.*)

10

On a typical day, Ms. Squirek would have a bowl of cereal and take a break.  (Tr. 45-46.)
She would then do some light chores and take a break.  (Tr. 46.)  She napped for an hour or two
in the afternoon and then she might put food in the oven for dinner.  (Tr. 46, 49-50.)  Once her
husband and son came home, they would eat dinner and relax before she went to bed by 9:00
p.m.  (Tr. 46.)  If she did not nap during the day, she said that she would be in bed between 5:00
and 6:00 p.m.  (Tr. 50.)  For fun, she and her family might play a board game.  (Tr. 46.)  Due to
Covid, she did not usually go anywhere.  (*Id.*)

>        **2.      Vocational Expert's Testimony**

A Vocational Expert ("VE") testified at the hearing.  (Tr. 50-58.)  The VE classified Ms.
Squirek's past work as a retail stock clerk as a heavy, semi-skilled job.  (Tr. 51.)  The VE
testified that a hypothetical individual of Ms. Squirek's age, education, and work experience and
with the functional limitations described in the ALJ's RFC determination—light work with
additional limitations of occasionally climbing ramps and stairs; never climbing ladders, ropes,
and scaffolds; frequently balancing; occasionally stooping, kneeling, crouching, and crawling;
and no exposure to hazards of unprotected heights, dangerous machinery, and commercial
driving—could not perform Ms. Squirek's past work as a retail stock clerk.  (Tr. 19, 52.)
However, the VE testified that there were light, unskilled jobs that the individual could perform,
including cashier, food service worker, and housekeeper.  (Tr. 52-53.)  If the hypothetical was
modified from light exertional work to sedentary work, the VE testified that the individual would
be unable to perform Ms. Squirek's past work and there were no skills that would transfer from
her past work.  (Tr. 53-55.)

The VE also testified that the jobs identified in response to the first hypothetical would
remain available if the individual described in the first hypothetical needed five unscheduled

breaks per day, for four or five minutes at a time. (Tr. 55-56.) However, he testified there would be no work available if the individual described in the first hypothetical needed two additional unscheduled breaks, every hour, two days a week for four or five minutes at a time. (Tr. 56-57.)

**D.     Third-Party Function Report**

On December 2, 2021, Ms. Squirek's husband completed a Third-Party Function Report. (Tr. 228-35.) He reported that Ms. Squirek had difficulty performing everyday chores and needed to take numerous breaks in between. (Tr. 229, 230.) He said she had shortness of breath, difficulty standing for long periods, and difficulty lifting anything weighing more than a gallon of milk. (Tr. 228.) She received assistance from him and their son with cooking and chores. (Tr. 229.) He observed her having a hard time falling asleep and staying asleep throughout the night. (*Id*.) She did not leave the house often due to Covid because of her immune system. (Tr. 231.) She was able to drive. (*Id*.) If Ms. Squirek went to the store, he said that he or their son went with her. (*Id*.) He also said that it took them a long time at the store because she had to take breaks and would have to lean on a cart to catch her breath. (*Id*.) He reported that Ms. Squirek's hobbies were limited to watching television and playing games on her phone. (Tr. 232.) He indicated that Ms. Squirek's condition affected her ability to lift, squat, bend, stand, reach, walk, climb stairs, and complete tasks. (Tr. 233.) He said she could walk about fifty feet and would then have to take a ten-minute break before continuing to walk. (*Id*.) He reported that Ms. Squirek did not have side effects from her medications. (Tr. 235.)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Furthermore:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and

vocational factors to perform other work available in the national economy.  *Id.*

## IV.     The ALJ's Decision

In her January 25, 2022 decision, the ALJ made the following findings:[2]

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.  (Tr. 17.)

2.     The claimant has not engaged in substantial gainful activity since May 1, 2020, the alleged onset date. (*Id.*)

3.     The claimant has the following severe impairments: chronic ischemic heart disease, valvular heart disease, and cardiomyopathy.  (Tr. 17-18.)

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 18.)

5.     The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; never be exposed to hazards such as unprotected heights, dangerous machinery, and commercial driving.  (Tr. 19-24.)

6.     The claimant is unable to perform past relevant work.  (Tr. 24-25.)

7.     The claimant was born in 1969 and was fifty years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  (Tr. 25.)

8.     The claimant has at least a high school education. (*Id.*)

9.     Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.    Considering the claimant's age, education, work experience, and residual functional capacity there are jobs that exist in significant numbers in the national economy that she can perform, including cashier, food service worker, and housekeeper.  (Tr. 25-26.)

---

[2] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Ms. Squirek had not been under a disability, as defined in the Social Security Act from May 1, 2020, through the date of the decision.  (Tr. 26.)

## V.  Plaintiff's Arguments

Ms. Squirek presents two assignments of error on appeal.  First, she argues the ALJ's finding that she had the RFC to perform light exertional work is not supported by substantial evidence.  (ECF Doc. 6, pp. 1, 7-10; ECF Doc. 9, pp. 1-2.)  Second, she argues the ALJ did not properly evaluate her subjective complaints regarding her symptoms.  (ECF Doc. 6, pp. 10-15.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakely*, 581 F.3d at 406.  The Commissioner's findings "as to any fact

15

if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakely*, 581 F.3d at 406, *quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakely*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"), *quoting Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit has explained: the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009), *quoting Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007), *citing Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-47 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011), *quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.      First Assignment of Error: Whether Light Exertional RFC Was Supported by Substantial Evidence**

Ms. Squirek argues in her first assignment of error that the ALJ was not supported by substantial evidence when she found Ms. Squirek had the RFC to perform light exertional work. (ECF Doc. 6, pp. 1, 7-10; ECF Doc. 9, pp. 1-2.)  In response, the Commissioner argues the light RFC is supported by substantial evidence.  (ECF Doc. 8, pp. 7-13.)

A claimant's RFC "is the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 404.1546(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.");  *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").

Here, the ALJ concluded that Ms. Squirek had the RFC:

> to perform light work as defined in 20 CFR 404.1567(b) except occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; never be exposed to hazards such as unprotected heights, dangerous machinery, and commercial driving.

(Tr. 19 (emphasis added).)  In support of this light RFC, the ALJ considered the subjective complaints of Ms. Squirek and her husband (Tr. 20-21), discussed the findings in her medical records in detail (Tr. 21-23), assessed the persuasiveness of the medical opinions (Tr. 23), and provided a detailed explanation for her RFC finding in light of all of the evidence (Tr. 24).

Ms. Squirek argues that the ALJ erred in finding she could perform light work.  (ECF Doc. 6, pp. 7-10; ECF Doc. 9.)  In support, she provides her own summary of the medical evidence and her subjective complaints (ECF Doc. 6, pp. 7-9), but does not specifically identify

17

any evidence that she asserts the ALJ misconstrued or failed to consider in assessing her RFC. Instead, she appears to offer two more specific arguments: (1) she was assessed at "NYHA class II," which was found to support a sedentary RFC in a different case; and (2) the light RFC "was based on her performance during cardiac rehabilitation."  (ECF Doc. 6, p. 9; ECF Doc. 9.)

As to Ms. Squirek's New York Heart Association ("NYHA") cardiac classification, the ALJ specifically acknowledged the August 2020 office visit where Ms. Squirek's cardiologist indicated he "considered her as having class II stage B congestive heart failure" in her decision. (Tr. 21 (citing Tr. 269 ("She is New York Heart Association class II stage B congestive heart failure.")).)  Ms. Squirek's citations to the initial and reconsideration determinations by the state agency (*see* ECF Doc. 6, p. 9 (citing Tr. 62, 65, 73)) further demonstrate that the same August 2020 office visit was considered by the state agency medical consultants in reaching their opinions regarding Ms. Squirek's physical RFC.  Notably, however, both state agency medical consultants concluded that Ms. Squirek could perform light exertional work, notwithstanding their consideration of her NYHA classification in August 2020.  (Tr. 64-65, 71-73.)  The undersigned therefore finds that Ms. Squirek's NYHA classification was appropriately considered and discussed by the ALJ in assessing Ms. Squirek's light RFC.

Ms. Squirek's citation to *Cormany v. Comm'r of Soc. Sec.*, No. 5:23cv933, 2022 WL 2611952 (N.D. Ohio May 20, 2022), does not change this analysis.  Far from holding that an NYHA II classification requires a restriction to sedentary exertional work, the court in *Cormany* upheld an ALJ's finding that a medical opinion limiting the plaintiff to less-than-sedentary work was unpersuasive.  *Cormany*, 2022 WL 2611952, at *4, *6-*9, *report and recommendation adopted sub nom. Cormany v. Kijakazi*, No. 5:21CV933, 2022 WL 4115232 (N.D. Ohio Sept. 9, 2022).  Indeed, the court went so far as to explain that the plaintiff's "bare reference to the

18

NYHA classification – indicating only slight physical limitations – [was] not consistent with the severity of limitation described in [his doctor's] opinion." *Id.* at *8.

The undersigned turns next to Ms. Squirek's argument that the ALJ improperly assessed a light RFC based on her performance in cardiac rehabilitation.  (ECF Doc. 6, p. 9; ECF Doc. 9.) In particular, Ms. Squirek argues: (1) while the cardiac rehab notes reflect that she tolerated her cardiac rehab sessions well, they "do not detail how she felt after these short sessions"; (2) at one session in December 2020, she had to rest between exercises; and (3) the ALJ failed to acknowledge that the treadmill walking captured in the cardiac rehab notes was "primarily less than 3.0 METS" when "the cardiac listings require less than 5.0 METS." [3]  (ECF Doc. 6, p. 9.)

As an initial matter, an ALJ need not discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  Here, the ALJ specifically discussed and cited to Ms. Squirek's cardiac rehab records for December 2020 and January, February, March, and April 2021.  (Tr. 22-23.)  She noted that Ms. Squirek continued to tolerate the exercise well throughout those sessions, with no complaints or symptoms.  (*Id.*)  The ALJ later contrasted those findings to Ms. Squirek's subjective complaints of weakness and limitations and walking, in further explanation for her assessment of Ms. Squirek's RFC limitations.  (Tr. 24.)

---

[3] In her reply brief, Ms. Squirek asserts that the ALJ also found incorrectly at Step Three "that Plaintiff had been able to perform exercise tolerance testing at 5 METS or less, so she did not satisfy the Listing." (ECF Doc. 9, p. 1.) Ms. Squirek did not challenge the ALJ's Step Three findings in her opening brief, nor does she adequately develop a Step Three challenge in her reply brief.  Thus, any attempt by Ms. Squirek to raise a challenge to the ALJ's Step Three findings is deemed waived.  *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (indicating that issues raised for the first time in a reply brief are waived.) (citation omitted); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations and bracket omitted).

First, Ms. Squirek's suggestion that the ALJ should not have relied on the cardiac rehab records because they only documented how she felt *during* her rehab sessions, not *after* each session, lacks merit.  Ms. Squirek was provided ample opportunity to raise subjective complaints that were not documented in her medical records, and the ALJ gave those complaints due consideration in light of the totality of the record, as discussed in Section VI.C., *infra*.

Second, as to the argument that Ms. Squirek had to rest between exercises during one cardiac rehab session in December 2020, the undersigned finds that Ms. Squirek has failed to show that the ALJ's failure to specifically discuss this record deprived her RFC determination of the support of substantial evidence. The record reflects that Ms. Squirek attended thirty-six cardiac rehabilitation sessions from December 23, 2020, through April 16, 2021.  (Tr. 333-402.) In all but two of her sessions, she was observed to tolerate the exercises well and voiced no complaints throughout the session.  (Tr. 333, 335, 340, 342, 344, 346, 348, 350, 352, 354, 356, 358, 360, 364, 366, 368, 370, 372, 374, 376, 378, 380, 382, 384, 386, 388, 390, 392, 394, 396, 398, 400, 402.)  There were only two sessions where complaints or symptoms were noted, in December 2020 and February 2021.  (Tr. 337, 362.)  The December 2020 session that was highlighted in Ms. Squirek's brief occurred one week after she started cardiac rehab; while this record notes that she tolerated the exercises well and voiced no complaints or symptoms throughout the session, it also notes that she reported feeling "sweaty after completing the arm egometer modality" and rested before moving on to the next modality.  (Tr. 337.)  In the context of the medical records as a whole, the undersigned finds that the ALJ's failure to specifically discuss the slightly abnormal findings in the December 2020 cardiac rehab office visit does not deprive his ultimate RFC finding of the support of substantial evidence.

Third, as to Ms. Squirek's argument that the ALJ "failed to note that Plaintiff's walking on the treadmill was primarily less than 3.0 METS" even though "the cardiac Listings require less than 5.0 METS" (ECF Doc. 6, p. 9), the undersigned finds that Ms. Squirek has again failed to demonstrate that the ALJ's RFC finding lacked the support of substantial evidence.

Although her reference to "the cardiac Listings" is vague and underdeveloped, Ms. Squirek appears to reference Listings 4.02 and 4.04, which relate to chronic and ischemic heart disease. To meet Listing 4.02, an individual must establish systolic or diastolic failure resulting in, inter alia, an "[i]nability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less" due to specified causes. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 4.02. To meet Listing 4.04, an individual must establish ischemic heart disease with symptoms due to myocardial ischemia while on a regimen of prescribed treatment with, inter alia, a "[s]ign- or symptom-limited exercise tolerance test" demonstrating one or more specified manifestations "at a workload equivalent to 5 METs or less." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 4.04. The Listings explain that a patient in an exercise tolerance test performs physical activities while providers record how their cardiovascular system responds. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 4.00(C)(3)(a). "Exercise testing is the most widely used testing for identifying the presence of myocardial ischemia and for estimating maximal aerobic capacity (usually expressed in METs—metabolic equivalents) [for people who] have heart disease." *Id.*

Here, Ms. Squirek does not argue that the ALJ failed to consider an exercise tolerance test in which she was unable to perform—or was otherwise limited by specified signs or symptoms—at a workload equivalent to 5 METs or less. That is consistent with the ALJ's unchallenged findings at Step Three that Ms. Squirek's "records have no exercise tolerance tests at listing level," and that she was not "unable to perform exercise tolerance testing at a workload

of 5 METs or less." (Tr. 18.)  Instead, Ms. Squirek argues that the ALJ erred because she failed to discuss the METs findings recorded at her individual cardiac rehab sessions.  A review of those records reflects that the maximum aerobic workload she reached at her first cardiac rehab session was 2.8 METs, which improved to 4.2 METs by her final session.  (Tr. 333, 402.)  But Ms. Squirek has failed to explain how records documenting the increasing aerobic capacity at which she was *able* to perform exercises "with no complaints or symptoms" over the course of her treatment (Tr. 22-23) may be considered in any way equivalent to an exercise tolerance test measuring the aerobic capacity at which she was *unable* to perform exercises.

SSR 96-8p sets forth the policies and policy interpretations regarding the assessment of RFCs and explains that an "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*."  SSR 96-8p, 61 Fed. Reg. 34474, 34474-75 (July 2, 1996) (emphasis in original).  This is consistent with the regulations, which establish that an RFC "is the most [a claimant] can still do despite [her] limitations."  20 C.F.R. § 416.945(a)(1). Here, where the cardiac rehab records demonstrated Ms. Squirek's improving ability to perform aerobic tasks without symptoms or complaints, the undersigned finds that the ALJ did not err in failing to document the specific aerobic workload at which she was performing.

Moreover, the ALJ did not rely solely on the cardiac rehab records to support her finding that Ms. Squirek had the RFC to perform light work.  She found Ms. Squirek's treatment following surgery was "very conservative," noting that she only had to see her cardiologist for follow up every six months.  (Tr. 24.)  The ALJ also considered Ms. Squirek's reports to her treating providers that she was doing well after surgery, with less shortness of breath, more endurance, no edema, and that she was walking regularly and had no cardiac symptoms in

August 2021.  (*Id.*)  Additionally, the ALJ found the state agency medical consultants' opinions—finding Ms. Squirek able to perform light exertional work—persuasive.  (Tr. 23.)

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406.  Even if substantial evidence supports Ms. Squirek's position that she cannot perform light exertional work, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  For the reasons explained, the undersigned finds that the ALJ did not ignore evidence or fail to account for limitations caused by Ms. Squirek's cardiac impairments when assessing her RFC.  The undersigned further finds that the ALJ's light RFC was supported by substantial evidence, including the opinions of the state agency medical consultants, conservative treatment following surgery, and improvement in symptoms and overall condition following treatment.

Accordingly, the undersigned finds the first assignment of error to be without merit.

## C.    Second Assignment of Error: Whether ALJ Properly Evaluated Ms. Squirek's Subjective Complaints

Ms. Squirek argues in her second assignment of error that the ALJ did not properly evaluate her subjective complaints regarding her symptoms.  (ECF Doc. 6, pp. 10-15.)  She further contends that the ALJ "failed to articulate any supportable rationale for her finding" and provided an "insufficient analysis" that "did not comply with the requirements of SSR 16-3p." (ECF Doc. 6, pp. 14-15.)  In response, the Commissioner argues the ALJ properly assessed Ms. Squirek's subjective complaints and that her findings regarding Ms. Squirek's subjective complaints were supported by substantial evidence.  (ECF Doc. 8, pp. 8-10, 13-14.)

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of

23

disability." *Jones*, 336 F.3d at 476; *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL

4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's

subjective complaints.") (citing *Jones*, 336 F.3d at 476); see also 20 C.F.R. § 404.1529(a) and

SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed Reg. 49462, 49463 (Oct. 25,

2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish

the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms,

a determination is first made as to whether there is an underlying medically determinable

impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-

3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007)

(citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the

intensity and persistence of the claimant's symptoms to determine the extent to which they limit

the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462,

49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 21),

so the discussion herein focuses on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ considers objective medical evidence, a claimant's

subjective complaints, information about a claimant's prior work record, and information from

medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R.

404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and

effectiveness of medications, treatment received to address symptoms, and other factors

concerning a claimant's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. 404.1529(c)(3).

Here, a review of the decision reveals that the ALJ considered the entire record, based her findings on relevant factors, and provided "specific reasons for the weight given to the individual's symptoms."  SSR 16-3p, 82 Fed. Reg. 49462, 49467.  The ALJ provided a detailed recitation of Ms. Squirek's subjective complaints and reported daily activities[4] (Tr. 20), but found her "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 21).  In support of this finding, the ALJ explained that Ms. Squirek had "significant cardiovascular impairments that developed in early 2020, but had significant improvement in her functioning following treatment."  (Tr. 21.)

The ALJ then proceeded to describe Ms. Squirek's treatment records and clinical findings from May 2020 through August 2021.  (Tr. 21-23.)  In particular, she detailed treatment records and clinical findings leading up to Ms. Squirek's multiple coronary artery bypass graft and mitral valve replacement in October 2020, including a classification at class II stage B congestive heart failure and an exercise ejection fraction as low as 37% in August 2020.  (Tr. 21-22.)  But she also detailed treatment visits and clinical findings after her surgery, including four months of cardiac rehab where she tolerated exercises well, without complaints or symptoms, and reports in August 2021 that she was walking and had no cardiac symptoms despite restarting smoking.  (Tr. 22-23.)  The ALJ specifically highlighted clinical findings that were normal throughout the records, or that improved or resolved over the relevant period.  (Tr. 23.)  The ALJ also found the medical opinion evidence—which supported a light RFC—to be persuasive.  (Tr. 23.)

---

[4] The ALJ acknowledged Ms. Squirek's husband's third-party function report, correctly noting that she was not required to articulate how she considered evidence from nonmedical sources.  (Tr. 20 (citing 20 C.F.R. § 404.1520c(d)).)  Ms. Squirek does not challenge this determination by the ALJ.

Finally, the ALJ provided a detailed explanation of her rationale for finding Ms.

Squirek's subjective complaints were not fully consistent with or supported by the record:

> [Ms. Squirek] described significant symptoms that were not supported by the treatment records. She claimed to have significant weakness and that she could not lift more than a gallon of milk. This was not mentioned to treatment providers and her strength was noted to be normal. [] She claimed to have significant limitations with walking. She testified she had pain her legs when walking. However, cardiac rehab records repeatedly noted she had no symptoms or complaints, including no reported pain, during cardiac rehab exercises. []
>
> Her treatment had been very conservative since recovering from surgery. By her own admission, she was only having to see her cardiologist for follow-ups every six months. [] If her symptoms were still as significant and ongoing as she reported, one would expect more regular ongoing treatment would be required.
>
> Records repeatedly documented she was doing well after her surgery with less shortness of breath and more endurance. [] Her shortness of breath had also improved with her medications. [] Her edema resolved after being on a water pill for a week. [] Since, she was noted to have no edema. []
>
> Records also noted that the claimant reported she was unable to work in part due to the COVID-19 pandemic, rather than just her impairments. [] She described being very pleased with her progress since surgery. She had more energy, less shortness of breath, and could walk with much less difficulty. She described having minimal chest discomfort during the day. [] At her most recent follow-up visit in August 2021, she described walking regularly and stated she had no cardiac symptoms. [] Thus, the claimant's allegations are not entirely consistent with the record.

(Tr. 24 (citations omitted).)  Thus, the decision clearly reflects that the ALJ considered Ms.

Squirek's reported symptoms, her treatment and responses to treatment, the objective medical

findings in her treatment records, and her reported activities of daily living before finding her

subjective statements were not entirely consistent with the totality of the record.  (Tr. 20-24.)

Ms. Squirek's conclusory arguments that "the ALJ failed to articulate any supportable

rationale for her finding that Plaintiff's statements. . . were not entirely consistent with the

medical evidence," that "[t]here was an insufficient analysis," or that the ALJ "did not comply

with the requirements of SSR 16-3p" (ECF Doc. 6, pp. 14-15) are without merit.  Although she

points generally to records showing decreased ejection fraction, cardiac surgery, a NYHA class II classification, and her need for rest during one cardiac rehab session (ECF Doc. 6, pp. 12-13), she fails to demonstrate that the ALJ lacked substantial evidence or adequate explanation to support her findings regarding Ms. Squirek's subjective complaints.

Ultimately, Ms. Squirek is asking this Court to reconsider the evidence that was already considered and weighed by the ALJ.  But it is not this Court's role to "try the case *de novo*, . . . resolve conflicts in evidence, []or decide questions of credibility."  *Garner*, 745 F.2d at 387. Instead, this Court may only consider whether the ALJ's findings were supported by substantial evidence.  Indeed, even if substantial evidence supported Ms. Squirek's interpretation of the evidence, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

For the reasons set forth above, the undersigned finds the ALJ was supported by substantial evidence in finding Ms. Squirek's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence of record. Accordingly, the undersigned finds the second assignment of error to be without merit.

### VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

March 18, 2024                                    /s/ Amanda M. Knapp
                                                 ───────────────────────────
                                                 AMANDA M. KNAPP
                                                 UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may forfeit the right to appeal the District Court's order.  *See
Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140
(1985).